**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-2327-RPM

STEVEN CHRISTOPHER TALLEY,

Plaintiff,

V.

CITY AND COUNTY OF DENVER;
DETECTIVE JEFFREY HART (92055);
SERGEANT ANDREW HOWARD (98004);
SERGEANT MARCO MARTINEZ (95086);
OFFICER JOHN RUDDY (00089);
OFFICER JAMES BRADLEY (00087), in their
individual and official capacities.

Defendants.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS PARTIAL MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(B)(6)**

---

**FISHER & BYRIALSEN PLLC**

/S/ Kaitlin F. Nares
***Kaitlin F. Nares Esq.***
***Jane Fisher-Byrialsen Esq.***
***David N. Fisher Esq.***
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street,9th Floor
Denver, Colorado 80237
Telephone:(303) 256-6345
Facsimile: (303) 954-0573
Email: Kaitlin@FBLaw.org
Email: Jane@FBLaw.org
Email: David@FBLaw.org
*Attorneys for Steven Talley*

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………………...1

STATEMENT OF FACTS…………………………………………………………………..2

STANDARD OF REVIEW………………………………………………………………...10

ARGUMENT……………………………………………………………………………….11

I. DEFENDANTS HOWARD AND HART ARE NOT ENTITLED TO
   QUALIFIED IMMUNITY……………………………………………………………11

    A. LEGAL STANDARD FOR QUALIFIED IMMUNITY………………………...11

    B. THE LAW WAS CLEARLY ESTABLISHED IN 2014………………………...12

    C. PLAINTIFF SUFFERED CONSTITUTIONAL DEPRIVATIONS……………13

        i. The Issuance of Arrest Warrants in this Case Did Not Substantiate
           Probable Cause Because the Arrest Warrants Contained False,
           Misleading, and Omitted Facts…………………………………………..14

        ii. Setting Aside the False and Misleading Facts and Considering the
           Omitted Exculpatory Facts, the Arrest Affidavits Would Not Have
           Given Rise to Probable Cause to Arrest…………………………………17

II. PLAINTIFF 'S MUNICIPAL LIABILITY CLAIM AGAINST THE CITY AND
    COUNTY OF DENVER SHOULD NOT BE DISMISSED……………………………20

    A. Defendant City and County of Denver's Failure to Adequately Train DPD
        Officers…………………………………………………………………………21

    B. The Officers Exceeded Constitutional Limitations on the Use of Force………...23

    C. The Use of Force Arose Under Circumstances that Constitute a Usual and
        Recurring Situation with which Police Officers Must Deal……………………..23

    D. The Inadequate Training Demonstrates a Deliberate Indifference on the part
        of Denver toward Persons with whom the Police Officers come into Contact….24

    E. Direct Causal Link Between the Constitutional Deprivation and the
        Inadequate Training…………………………………………………………...29

CONCLUSION…………………………………………………………………………… 30

CERTIFICATE OF SERVICE…………………………………………………………..30

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Adams v. Garvin Cnty. Bd. of Cnty. Comm'rs*, 2016 US Dist LEXIS 128765,
at *60 [WD Okla Sep. 21, 2016, No. CIV-14-1337]…………………………………...............24

*Allen v. Muskogee*, 119 F3d 837 (10th Cir 1997)……………………………………....21, 22, 25

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2007)…………………………………………………………10

*Barney v. Pulsipher*, 143 F.3d 1299 (10th Cir. 1998)………………………………………….24

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)………………………………………...10, 11

*Board of County Comm'rs v. Brown*, 117 S. Ct. 1382 (1997)…………………………………22

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125 (10th Cir. 2014)…………..21

*Brown v. Gray*, 227 F3d 1278 (10th Cir 2000)……………………………………………….24, 29

*Brown v. Montoya*, 662 F.3d 1152 (10th Cir. 2011)……………………………………………10

*Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003)………………………………………….25

*Casanova v. Ulibarri,* 595 F.3d 1090 (10th Cir. 2009)…………………………………………10

*Cayman Exploration Corp. v. United Gas Pipe Line Co.*, 873 F.2d 1357 (10th Cir. 1989)………10

*City of Canton v. Harris*, 489 U.S. 378 (1989)………………………………………………....21

*Conley v. Gibson,* 355 U.S. 41 (1957)………………………………………………………….11

*Dias v. City and County of Denver*, 567 F.3d 1169 (10th Cir. 2009)…………………………10, 11

*Granato v. City & County of Denver*, 2011 US Dist LEXIS 97007, at *6 (D Colo
Aug. 30, 2011, Civil Action No. 11-cv-00304-MSK-BNB)………………………………….11

*Gilles v. Davis*, 427 F.3d 197 (3d Cir. 2005)…………………………………………………22

*Guffey v. Wyatt*, 18 F.3d 869 (10th Cir. 1994)……………………………………………….13

*Hall v. Bellman,* 935 F.2d 1106  (10th Cir. 1991)…………………………………………...10

*Houston v. Hill*, 482 U.S. 451 (1987)………………………………………………………….13

*Jones v. Lehmkuhl*, 2013 US Dist LEXIS 139229, at *50-51 (D. Colo.

Apr. 26, 2013, Civil Action No. 11-cv-02384-WYD-CBS)…………………………………………..22

*Kaufman v. Higgs*, 697 F3d 1297 (10th Cir. 2012)……………………………………………12

*Kentucky v. Graham,* 473 U.S. 159 (1985)……………………………………………………12

*Klein v. Coblentz*, No. 96-1289, 1997 U.S. App. LEXIS 32757, at *19 (10th Cir. 1997)………..13

*Maryland v. Pringle,* 540 U.S. 366 (2003)……………………………………………………18

*Moore v. Guthrie*, 438 F.3d 1036 (10th Cir. 2006)……………………………………………10

*Patrick v. Miller*, 953 F.2d 1240 (10th Cir. 1992)……………………………………………..13

*Pearson v. Callahan*, 555 U.S. 223 (2009)……………………………………………………12

*Reichle v. Howards*, 132 S.Ct. 2088 (2012)……………………………………………………13

*Roska v. Peterson*, 328 F3d 1230 (10th Cir 2003)……………………………………………13

*Sanchez v. Hartley*, 65 F Supp 3d 1111 (D. Colo. 2014)………………………………………11

*Saucier v. Katz*, 533 U.S. 194 (2001)…………………………………………………………12

*Simpson v. Univ. of Colo. Boulder,* 500 F3d 1170 (10th Cir 2007)………………………………24

*Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990)………………………………………………13

*Sperry v. Maes*, 592 F App'x 688 (10th Cir 2014)…………………………………………14, 19

*Taylor v. Meacham*, 82 F.3d 1556 (10th Cir. 1996)……………………………………………14

*Toevs v. Reid,* 646 F.3d 752 (10th Cir. 2011)…………………………………………………11

*United States v. Alonso*, 790 F.2d 1489 (10th Cir. 1986)………………………………………17

*United States v. Valenzuela*, 365 F.3d 892 (10th Cir. 2004)……………………………………..18

*Wilkins v. Dereyes*, 528 F3d 790 (10th Cir. 2008)……………………………………………14

*Wilson v. Layne*, 526 U.S. 603 (1999)………………………………………………………...12

*Wolford v. Lasater*, 78 F.3d 484 (10th Cir. 1996)……………………………………………14

*Zuchel v. City and County of Denver*, 997 F.2d 730 (10th Cir. 1993)………………………21, 25

Kaitlin F. Nares, Esq., Jane Fisher-Byrialsen, Esq., and David N. Fisher, Esq. of Fisher & Byrialsen, PLLC, on behalf of Plaintiff, Steven Christopher Talley, respond to Defendants' Partial Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) as follows:

## INTRODUCTION

Plaintiff seeks relief pursuant to 42 USC §1983 for violations of his constitutional rights. On February 23, 2017, Plaintiff filed a Second Amended Complaint. *See* Dkt. # 42.  Defendants Marco Martinez, John Ruddy, and James Bradley partially answered Plaintiff's Second Amended Complaint by answering all statements of fact and answering Plaintiff's Second Claim for Relief for Excessive Force. *See* Dkt. # 46.  Defendants Martinez, Ruddy and Bradley reserved answering the remainder of Plaintiff's Claims for Relief and now move to dismiss Plaintiff's False Arrest, Malicious Prosecution, and Retaliation claims.  At this time, Plaintiff voluntarily dismisses his claims against Defendants Martinez, Ruddy, and Bradley for False Arrest, Malicious Prosecution and Retaliation.[1]  Defendants Jeffrey Hart and Andrew Howard also move to dismiss Plaintiff's claims for False Arrest, Retaliation, and Malicious Prosecution.[2]  Defendant City and County of Denver moves to dismiss Plaintiff's claim for Municipal Liability.

Plaintiff asks the Court to deny Defendants' Hart, Howard, and the City and County of Denver's Motion to Dismiss in its entirety.  As a central issue, Defendants fail to view the facts in the light most favorable to Plaintiff, and doing so, ignore particular facts that support cognizable claims at this early stage of litigation.  Plaintiff need only plead facts that nudge his claims from conceivable to plausible.  He has done so.

---

[1] Plaintiff will proceed in litigation against Defendants Martinez, Ruddy, and Bradley on a claim of Excessive Force.

[2] Plaintiff voluntarily dismisses any claim, against any Defendant, premised on the Third and Fifth Amendment.

**STATEMENT OF FACTS**

The events underlying Plaintiff's claims for relief span from May 14, 2014 to April 21, 2016.  On May 14, 2014 from approximately 5:00 a.m. to 5:00 p.m., Plaintiff was at work at Transamerica Capital located in the Denver Tech Center in the City of Denver. *See* Dkt. # 42 at ¶ 20.   While Plaintiff was at work at Transamerica Capital at approximately 11:17 a.m., an unknown male entered the US Bank located at 6333 E. Colfax Avenue in Denver, Colorado and demanded $5,000 from teller Miurjana Dengubie. *Id.* at ¶ 22. Off-duty Denver Police Officer Michael Ahrens was moonlighting as a security guard for the US Bank and was injured while attempting to apprehend the bank robber. *Id.* at ¶ 23-24.  A DNA swab and a fingerprint sample were later taken from the scene and neither the print or the swab matched Plaintiff. *Id.* at ¶ 25-26.

On September 5, 2014, Plaintiff was unemployed and accepting assistance from the University Church's food bank located at 2000 S. Milwaukee St., Denver, Colorado 80210-3521. *Id.* at ¶ 28. On that day, Plaintiff arrived at the University Church's food bank at 7:50 a.m. and arrived home from the food bank at approximately 9:40 a.m. *Id.* at ¶ 30, 33.  Steven had missed a call from Icon Advisers and returned the call at 9:46 a.m. *Id.* at ¶ 32-33. While Plaintiff was at the food bank, at approximately 9:27 a.m., an unknown male entered the US Bank located at 2555 S. Colorado Boulevard, in Denver, and gave a note to teller Bonita Shipp demanding money. *Id.* at ¶ 34.

Defendants Jeffrey Hart and Andrew Howard were assigned to head the investigation of the May 14, 2014 and September 5, 2014 robberies.  *Id.* at ¶ 36.  Based on Bonita Shipp's description to law enforcement, Defendants Jeffrey Hart and Andrew Howard authorized the release of a Bank Robbery Bulletin describing the suspected bank robber as 40 years old, 6 feet

tall, and thin to medium build.  *Id.* at ¶ 37.  At that time, Plaintiff was 45 years old, 6 feet 3 ½ inches tall, and approximately 240 pounds.  *Id.* at ¶ 38.

A tip was provided to law enforcement from the Bank Robbery Bulletin identifying Plaintiff. *Id.* at ¶ 39.  As a result, on September 15, 2014, Defendant Jeffrey Hart created a six picture photo array with one of the database photographs of Plaintiff placed in the number three position.  *Id.*  The other 5 photographs were "fillers" and all 5 fillers only bare slight physical similarity to Plaintiff.  *Id.* at ¶ 40. That day, Defendant Jeffrey Hart went to the US Bank located at 2555 S. Colorado Blvd in Denver, which was the location of the September 5, 2014 robbery, and met with bank teller Bonita Shipp. *Id.* at ¶ 41. Defendant Hart had both created the photo array, and administered the identification procedures in violation of protocols.  *Id.* at ¶ 42.  Before he administered the photo array, Defendant Hart told Bonita Shipp that Plaintiff was the individual suspected of the September 5, 2014 robbery, and Hart physically pointed to Plaintiff's photograph while Bonita Shipp was viewing the photo array.  *Id.*  Even with Defendant Hart's blatant suggestion to identify Plaintiff, Bonita Shipp could only indicate with 85% certainty that Plaintiff was the individual who robbed the US Bank on September 5, 2014.[3]  *Id.* at ¶ 43.

Defendant Hart also conducted photo arrays for the May 14, 2014 robbery.  None of the witnesses of that robbery identified Plaintiff as the bank robber. *Id.* at ¶ 44.  In fact, both the bank teller and off-duty officer identified "fillers" in the photo arrays instead of Plaintiff. *Id.*

Defendant Hart authored an arrest warrant affidavit.  *Id.* at ¶ 45. Defendant Hart failed to disclose in that arrest warrant that no eyewitnesses identified Plaintiff for the May 14, 2014 robbery

---

[3] Ms. Shipp later recanted her identification at a preliminary hearing.  She also told reporters about Hart's improperly suggestive behaviors during the administration of the photo array.

or that the eyewitness of the September 5, 2014 robbery, Bonita Shipp, was subject to improper identification procedures and that her identification had been tainted because of the suggestive way Defendant Hart conducted the photo array. *Id.*

On September 15, 2014, Defendants John Ruddy, Marco Martinez, and James Bradley were assigned to arrest Plaintiff. *Id.* at ¶ 46. During the execution of the arrest warrant, an unidentified undercover officer used trickery to lure Plaintiff out of his house at approximately 8:30 p.m. *Id.* at ¶ 47. At the time, Plaintiff was only wearing boxer shorts and a sleeveless t-shirt. *Id.* Based on a lie by the undercover officer that he hit Plaintiff's car, Plaintiff walked out to where his car was parked and the undercover officer directed Plaintiff to look by the front driver's side of the car. *Id.* at ¶ 48-49. As Plaintiff bent down to look at the alleged damage to his vehicle, two noise flash diversionary devices (flash bangs) were deployed by members of the Denver Police Department. *Id.* at ¶ 49. While he was blinded and deafened from the flash diversionary devices, Defendants Ruddy, Martinez, and Bradley descended upon Plaintiff. *Id.* at ¶ 51.

At no time did Plaintiff resist Defendants Ruddy, Martinez and Bradley. *Id.* at ¶ 52. Defendants Ruddy, Martinez, and Bradley body slammed Plaintiff to the ground and his hands were then bound behind his back with zip ties. *Id.* at ¶ 54. While Plaintiff's hands were bound behind his back, Defendant Martinez kicked Plaintiff in the ribs. *Id.* at ¶ 55. At the same time, Defendant Ruddy hit Plaintiff in his lower back, buttocks and right leg with a hard object. *Id.* Also at this same time, Defendant Bradley pushed his knee against Plaintiff's neck and face with extreme pressure forcing Plaintiff's face into the ground. *Id.* Defendant Bradley also used a hard object to hit Plaintiff several times on his arms. After the initial assault, Plaintiff was picked up from the ground by Defendants Ruddy, Martinez, and Bradley. *Id.* at ¶ 56. Other uniformed

Denver Police Department officers switched Plaintiff's zip ties to metal handcuffs. *Id.* Defendant Ruddy assaulted Plaintiff a second time by hitting him in the groin with an expandable baton, know as an asp, while Plaintiff's hands were cuffed behind his back.   *Id.* at ¶ 57.

Defendants Martinez, Ruddy, and Bradley's assault of Plaintiff was the result of a pattern and practice in Denver of failing to train its officers in proper use of force.   *Id.* at ¶ 123.   The Denver Police Department's Use of Force Policy, formally contained in Section 105.01 *et seq* of the Department's Operational Manual, gives officers complete and utter discretion in determining use of force when an individual is *restrained*. *Id.* at ¶ 126.   The policy only mentions "[w]hen a suspect is under control, either through the application of physical restraint or the suspect's compliance, the degree of force shall be de-escalated accordingly." *Id.* at ¶ 127.   If a person is under control, then they are by definition not resisting and no force whatsoever should be required. *Id.*   However, the policy simply states that force should be de-escalated implying a lesser amount than previously is permissible. *Id.*   Furthermore, though the Department's Operational Manual discusses the use of a lethal weapon and alternatives to using a lethal weapon, there is no discussion about when the use of kicking, punching, and slamming to the ground is appropriate. *Id.*

The insufficiencies in the Department Operations Manual, related to proper use of force against a restrained individual, existed prior to Plaintiff's assault. Denver Police Department officers are trained pursuant to the Department Operations Manual.  By information and belief, Denver Police Department officers are not properly trained on the use of force to be used against restrained individuals.  Denver's training was therefore insufficient. The insufficient training lead to Plaintiff's assault. Though Defendant Martinez, Ruddy and Bradley's egregius actions in this case are a singular incident, their actions are similar to numerous other incidences of excessive force used by Denver Police Department Officers on those that are not resisting, not creating a

danger to others, and who are in custody or under restraint.  *Id.* at ¶ 130.  In this case, use of such excessive force on an unarmed, nonresistant, and handcuffed individual was excessive under the law, objectively unreasonable, and exceeded constitutional limitations on the use of force. *Id.* at ¶ 132.

The Supreme Court in *City of Canton v. Harris*, 489 US 378 (1989) previously held that the situation Defendants Ruddy, Martinez, and Bradley faced on the day of Plaintiff's assault was a type that officers can reasonably expect to confront and foreseeably use force because Plaintiff was suspected of being a fleeing felony.  *Id.* at ¶ 133, 134.  Prior civil suits against the City and County of Denver for similar assaults of individuals that were unarmed and restrained created actual or constructive notice that the officers involved were not properly trained. *Id.* at ¶ 130. Notwithstanding such notice, the inadequate training of Defendants Ruddy, Martinez, and Bradley demonstrated deliberate indifference on the part of the City and County of Denver towards persons with whom the police officers come into contact.    *Id.* at ¶ 135.  There was a direct causal link between the excessive force violation in this case and the inadequate training. *Id.* at ¶ 141, 142, 143.

After Plaintiff's arrest and brutal assault, he was incarcerated for four days prior to official charges being filed on September 19, 2014. *Id.* at ¶ 61. During these four days, Defendants Jeffrey Hart and Andrew Howard interviewed numerous bank employees and witnesses from the May 14, 2014 and September 5, 2015 robberies; none of whom could identify or accurately describe Plaintiff.  *Id.* at ¶ 62, 65, 66.  Notwithstanding this lack of corroboration, on September 19, 2014, Plaintiff was wrongly charged, without probable cause, with commission of the May 14, 2014 and September 5, 2014 robberies and assault on Police Officer Michael Aherns on May 14, 2014.  *Id.*

at ¶ 63.  The District Attorney's Office ultimately dismissed all charges against Plaintiff after they were provided proof from the corporate office of Transamerica Capital that Plaintiff was at work at the time of the May 14, 2014 robbery. *Id.* at ¶ 68, 69.  Plaintiff was released on November 13, 2014, approximately 60 days after his unlawful arrest. *Id.* at ¶ 70.

Upon his release, Plaintiff told Defendant Jeffrey Hart that he would report him to the Internal Affairs Bureau for unlawful conduct. *Id.* at ¶ 72. Following the complaint against Defendant Hart, Plaintiff received threats from Defendants Hart and Howard that they would bring future charges against him. *Id.* at ¶ 74.  Soon after, in an effort to retaliate against Plaintiff, Defendant Jeffrey Hart and Defendant Andrew Howard reopened an investigation of Plaintiff as to the dismissed bank robbery that occurred on September 5, 2014. *Id.* at ¶ 75.

Based on Plaintiff's complaint against Defendant Hart, on April 16, 2015, the Internal Affairs Bureau determined that Defendant Hart violated departmental procedures by conducting an improper photo array, resulting in a stain on his permanent employment record. *Id.* at ¶ 73, 76, 77.  Internal Affairs found that Defendant Hart's "action was not in accordance with department policy which requires an investigating detective to use a blind lineup procedure in any case where a felony crime is being investigated." *Id.* at ¶ 77.

The very same day that Internal Affairs rendered its determination, Defendant Hart sent a request to the FBI's Forensic, Audio, and Image Analysis Unit ("FAVIAU") in Quantico requesting that the FBI conduct image enhancement and facial comparison of Plaintiff's database photograph with the surveillance still frames from the May 14, 2014 and September 5, 2014 robberies. *Id.* at ¶ 79, 80. The FBI's FAVIAU agents did not conduct "facial recognition". *Id.* at ¶ 81. Facial recognition is typically analyzed through the FBI's Biometric Services Division of

the Criminal Justice Information Service's Office in West Virginia. *Id.* at ¶ 82. Facial recognition involves analyzing an image against a large database of facial images to generate a match. *Id.* at ¶ 83. Facial Recognition is merely an investigative tool and not a basis alone for probable cause to arrest. *Id.*

Here, Defendant Hart requested agents in Quantico to conduct a human comparison, rather than computer generated facial recognition. *Id.* at ¶ 84. Human comparisons of pictures are statistically less reliable than use of facial recognition software. *Id.* at ¶ 85.  On May 27, 2015, Defendant Hart received results of the FAVIAU human analysis. *Id.* at ¶ 86.  The analysis concluded that the pictured suspect from the September 5, 2014 robbery shared characteristics including "moles/markings" with Plaintiff.  However, the database photograph of Plaintiff had two distinctive moles on his right cheek and the surveillance still frames from the September 5, 2014 robbery did not depict such moles. *Id.*

On June 14, 2015, Defendant Hart drafted a search warrant for Plaintiff's cellular phone number which was so ordered by the Court on June 29, 2015.  *Id.* at ¶ 89. On July 28, 2015, Detective Hart utilized the Cell Hawk cellular phone records analysis software to conduct an initial triage analysis of Plaintiff's cell phone records. *Id.* at ¶ 90.  The cell tower analysis showed that Plaintiff's cell phone was pinging off a cell tower that was within 20 minutes of the September 5, 2014 robbery which occurred at approximately 9:27 a.m. *Id.* at ¶ 91. However, these cell phone calls made within 20 minutes of the robbery were within the coverage area of Plaintiff's residence. *Id.* at ¶ 92.  Results of a search warrant for Icon Advisers' phone records revealed that the incoming call at 9:22 a.m. was from Icon Adviser employee Annie Mapple, from the HR Department, who left a voice message about Plaintiff having expressed interest in employment at

Icon Advisers and a name and return phone number to call. *Id.* at ¶ 93. The out-going call at 9:46 a.m. was from Plaintiff to Icon Advisers and covered the conversation that Plaintiff had with Annie Mapple. *Id.* at ¶ 94. Neither of the calls were in anyway related to the robbery.

On December 10, 2015, Plaintiff was arrested at the Crossroads Shelter at the direction of Defendants Hart and Howard. *Id.* at ¶ 95. Plaintiff was charged with one count of aggravated robbery for the September 5, 2014 bank robbery and he was detained in the Denver County Jail. *Id.* at ¶ 96. More than 4 months later, on January 11, 2016, a Preliminary Hearing was held before Honorable James Breese. *Id.* at ¶ 97. At the hearing, the defense called Bonita Shipp and she emphatically testified that the person that robbed her and Plaintiff were "not the same person" stating "[i]t's not him. It's not the guy that robbed me." [4] *Id.* at ¶ 98, 99. Bonita Shipp later told FOX 31 Denver news that Plaintiff "was an innocent man, he didn't do it." *Id.* at ¶ 100. Bonita Shipp stated that the robber had distinctive markings on his hands which Plaintiff did not have. *Id.* at ¶ 101. At the hearing, Linda Kay Hicks, a member of University Church for over 40 years, testified that Plaintiff checked into the Church's food bank on the morning of September 5, 2014. *Id.* at ¶ 102. She testified that Plaintiff arrived at the University Church's food bank at 7:50 a.m. on September 5, 2014, to place his name on the waitlist, the doors to the food bank opened at approximately 9:20 a.m., and Plaintiff was approximately the 25th person in line to enter the food bank. *Id.* at ¶ 103, 104.

After the hearing, FBI analysis revealed that the individual captured on the surveillance video from the September 5, 2015 robbery was 6 feet ½ inch tall. *Id.* at ¶ 111. Plaintiff was 6 feet

---

[4] Ms. Shipp said this while pointing at Mr. Talley in the courtroom.

3 ½ inches tall. *Id.* at ¶ 112.  All charges against Plaintiff were dismissed on April 21, 2016. *Id.* at

¶113

## STANDARD OF REVIEW

To survive a motion to dismiss, a plaintiff's pleadings must "nudge[] their claims across

the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  In

*Ashcroft v. Iqbal*, the Supreme Court applied this standard to a motion to dismiss based on qualified

immunity, and formulated the test as follows:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted
> as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility
> when the plaintiff pleads factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged.  The plausibility standard
> is not akin to a probability requirement, but it asks for more than a sheer possibility that a
> defendant has acted unlawfully.  Where a complaint pleads facts that are merely consistent
> with a defendant's liability, it stops short of the line between possibility and plausibility of
> entitlement to relief.

129 S.Ct. 1937, 1949 (2007) (quotations and citations omitted).  In reviewing a motion to dismiss,

"all well-pleaded factual allegations in the ...complaint are accepted as true and viewed in the light

most favorable to the nonmoving party." *Brown v. Montoya,* 662 F.3d 1152, 11662-63 (10th Cir.

2011) (*quoting Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir. 2006); *Casanova v. Ulibarri,*

595 F.3d 1090, 1098 (10th Cir. 2009).  Furthermore, this Court may consider exhibits attached to

the Complaint without converting the motion into one for summary judgment pursuant to Rule 56.

*See Hall v. Bellman,* 935 F.2d 1106, 1112 (10th Cir. 1991).  The Court is to consider these precepts

together, "[w]hen reviewing a motion to dismiss, the court must: (1) incorporate the "powerful

presumption" against rejecting pleadings for failure to state a claim, (2) accept all allegations in

the complaint as true, and (3) draw all reasonable inferences in favor of the nonmoving party."

*Cayman Exploration Corp. v. United Gas Pipe Line Co*., 873 F.2d 1357, 1359 (10th Cir. 1989);

*Dias v. City and County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009).

Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias*, 567 F.3d at 1178 (quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Sanchez v. Hartley*, 65 F Supp 3d 1111, 1120 (D. Colo. 2014) (quoting *Twombly*, 550 U.S. at 556).  "The Complaint should not be dismissed for failure to state a claim 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Granato v. City & County of Denver*, 2011 US Dist LEXIS 97007, at *6 (D Colo Aug. 30, 2011, Civil Action No. 11-cv-00304-MSK-BNB) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

## ARGUMENT

## I.   DEFENDANTS HOWARD AND HART ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Defendants Hart and Howard assert that they are immune from suit for False Arrest, Retaliation, and Malicious Prosecution because Plaintiff did not experience a constitutional deprivation.  Defendants argue that Plaintiff did not experience a constitutional deprivation because there was probable cause for both of his arrests.  This argument is incorrect as a matter of fact and law.

## A.   LEGAL STANDARD FOR QUALIFIED IMMUNITY

The doctrine of qualified immunity shields state actors performing discretionary functions from liability for damages unless the conduct they engaged in violated "clearly established" statutory or constitutional rights. *Toevs v. Reid,* 646 F.3d 752 (10th Cir. 2011).

Qualified immunity "operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Saucier v. Katz*, 533 U.S. 194, 206, (2001).   Title 42 U.S.C. §1983 provides that "[e]very person who, under color of any statute… subjects, or causes to be subjected, any citizen of the United States… to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured."   In suits brought against officials in their individual capacities, officials may raise the defense of qualified immunity.  *Kentucky v. Graham,* 473 U.S. 159, 166-67 (1985).  "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231(2009) (internal citations omitted).  Therefore, "a plaintiff must properly allege a deprivation of a constitutional right and must further show that the constitutional right was clearly established at the time of the violation." *Kaufman v. Higgs*, 697 F3d 1297 (10th Cir. 2012) (internal citations omitted).  Even though Plaintiff bears the burden of making this two-part showing, the Tenth Circuit "construes the facts in the light most favorable to the plaintiff as the nonmoving party." *Id.*

**B.     THE LAW WAS CLEARLY ESTABLISHED IN 2014**

First and foremost, Defendants Hart and Howard do not challenge whether the law, related to Plaintiff's False Arrest, Retaliation, and Malicious Prosecution claims, were clearly established. Nonetheless, it is clear that the Supreme Court as well as Tenth Circuit had held the law related to Plaintiff's claims clearly established well prior to 2014.

In determining whether a right was "clearly established," the court assesses the objective legal reasonableness of the action at the time and asks whether "the right is sufficiently clear that a reasonable officer would understand that what he is doing violates that right." *Wilson v. Layne*,

526 U.S. 603, 615 (1999). This does not require a plaintiff to establish a "precise factual correlation between the then-existing law and the case at hand." *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir. 1992)(quoting *Snell v. Tunnell*, 920 F.2d 673, 699 (10th Cir. 1990)). In this case, Plaintiff's right to be free from False Arrest, Malicious Prosecution, and Retaliation was clearly established in 2014. *See Guffey v. Wyatt*, 18 F.3d 869, 872 (10th Cir. 1994) ("The right to be free from arrest without probable cause is a clearly established constitutional right."); *see also Roska v. Peterson*, 328 F3d 1230, 1244 (10th Cir 2003) (Malicious Prosecution); *Klein v. Coblentz*, No. 96-1289, 1997 U.S. App. LEXIS 32757, at *19 (10th Cir. Nov. 19, 1997) (Since before 1997, it has been clearly established that a police officer may "not interfere with [a plaintiff's] right to free speech or retaliate against him for exercising it by subjecting him to a malicious prosecution."); *Reichle v. Howards*, 132 S.Ct. 2088 (2012) (retaliation); *Houston v. Hill*, 482 U.S. 451, 463 (1987) (The United States Supreme Court has held that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."). Plaintiff has sufficiently met his burden of establishing the first prong of the qualified immunity analysis.

## C.   PLAINTIFF SUFFERED CONSTITUTIONAL DEPRIVATIONS

Secondly, Plaintiff can establish that he suffered constitutional deprivations at the hands of Defendant Hart and Howard. Plaintiff's claims for False Arrest, Retaliation, and Malicious Prosecution each share a common element; a lack of probable cause at the time of arrest. This is the only element that Defendants address, thus conceding the merits of all other elements of Plaintiff's claims as cognizable.[5] Plaintiff therefore addresses probable cause only.

---

[5] The Defendants are barred from challenging, for the first time, the sufficiency of all other elements of Plaintiff's False Arrest, Malicious Prosecution and Retaliation claims in their Reply.

Defendants argue that they are entitled to qualified immunity because there was probable cause for both of Plaintiff's arrests. Defendants assert that probable cause for Plaintiff's arrests was substantiated because arrest warrants were issued. Defendants' argument is ill-conceived. Both of Defendant Hart's arrest warrant affidavits contained false, misleading and omitted facts. Under such circumstances, the Tenth Court directs the District Court to set aside the false and misleading facts, consider the omitted exculpatory evidence, and only then, determine if the affidavit would still have given rise to probable cause for the issuance of the warrant. In this case, after setting aside the false and misleading facts, and considering the omitted exculpatory evidence, neither arrest warrant affidavit gave rise to probable cause for issuance of the warrant.

i.    **The Issuance of Arrest Warrants in this Case Did Not Substantiate Probable Cause Because the Arrest Warrants Contained False, Misleading, and Omitted Facts**

Plaintiff was arrested twice pursuant to an arrest warrant. A plaintiff can challenge the probable cause determination supporting the warrant's issuance. *Wilkins v. Dereyes*, 528 F3d 790, 798-799 (10th Cir. 2008) (citing *Taylor v. Meacham*, 82 F.3d 1556, 1562 (10th Cir. 1996) (analyzing the Fourth Amendment malicious prosecution claim "that the affidavit prepared . . . in support of the arrest warrant contained deliberately false statements and omissions, thereby misleading the judge into issuing the arrest warrant"). "Where false statements have been included in an arrest warrant affidavit, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996) (internal citations and quotation marks omitted); *see also Sperry v. Maes*, 592 F App'x 688, 695 (10th Cir 2014). "In a case involving information omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted

information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant." *Id.*

In this case, the arrest warrant affidavits, authored by Defendant Hart, contained false, misleading, and omitted facts that certainly misled the judge into issuing the arrest warrants. Under such circumstances, the Court should set aside the false and misleading facts and consider omitted exculpatory evidence in determining the existence of probable cause.

Pursuant to Defendant Hart's first arrest affidavit, probable cause for arrest existed because (1) an anonymous tip to law enforcement identified Plaintiff, (2) Plaintiff's estranged wife identified him, and (3) the bank teller of the September robbery identified him. *See* Def's Motion to Dismiss at Exhibit A-2. Defendant Hart, however, made misleading statements and omitted exculpatory information that would have eviscerated probable cause for arrest. *Id.*

First, Defendant Hart did not mention that law enforcement had failed to verify the veracity of the anonymous tip that identified Plaintiff. *Id.* This anonymous and unverified tip was the only link between Plaintiff and the May 2014 robbery. Second, Defendant Hart failed to state that Plaintiff's wife was not an eyewitness to any robbery, and the surveillance pictures she reviewed were of a person wearing a hat and/or glasses. Third, and most egregious, Defendant Hart mislead the Court involving Bonita Shipp's identification of Plaintiff for the September robbery. Defendant Hart omits that prior to Bonita Shipp's identification, Defendant Hart (1) told Bonita Shipp that Plaintiff was a suspect and (2) physically pointed to Plaintiff's picture. As a result of Defendant Hart's misrepresentations and omissions, the Court issued the arrest warrant.

For the same reasons, Defendants cannot rely on the issuance of the second arrest warrant to support Plaintiff's re-arrest for the September robbery. Pursuant to Defendant Hart's second arrest affidavit, probable cause existed because (1) Plaintiff's roommate identified Plaintiff from

a surveillance picture, (2) the bank teller of the September robbery identified Plaintiff, (3) a FAVIAU analysis identified Plaintiff from a surveillance picture, and (4) an incoming and outgoing call from Plaintiff's cell phone were made near the time and location of the September robbery. *See* Def's Motion to Dismiss at Exhibit A-5. However, when the Court signed Defendant Hart's second arrest warrant, it was not made aware of false, misleading, and omitted facts that would have eviscerated probable cause for arrest.

First, Defendant Hart's second arrest affidavit failed to state that Plaintiff's roommate was not an eyewitness to any robbery, and the surveillance pictures the roommate reviewed were of a man with a hat and/or glasses on. *See* Def's Motion to Dismiss at Exhibit A-5.   Again, Defendant Hart failed to alert the Court that prior to Bonita Shipp's identification, Defendant Hart told her that Plaintiff was a suspect and pointed to Plaintiff's picture.   Third, Defendant Hart mislead the Court as to the nature and results of the FAVIAU analysis.   The FAVIAU analysis stated that Plaintiff and the pictured suspect from the September 5, 2014 robbery "shared characteristics" and that Plaintiff "appeared" to be the person depicted in the surveillance image. *See* Def's Motion to Dismiss at Exhibit A-4.   The FAVIAU analysis did not provide any degree of certainty supporting its analysis. However, Defendant Hart explicitly wrote in his second arrest affidavit that "the analysis *concluded* that the robbery suspect in the video surveillance on 9/05/2015 *was* [Plaintiff]." *See* Def's Motion to Dismiss at Exhibit A-5 (emphasis added).   This statement was false and misleading.   Moreover, Defendant Hart omitted the fact that the photo of Plaintiff that Defendant Hart sent to FAVIAU showed two distinctive moles on his right cheek and the surveillance still frames from the September 5, 2014 robbery did not depict such moles. *See* Dkt. # 42 at ¶ 87. Lastly, Defendant Hart asserted in his second arrest affidavit that Plaintiff's cell phone had an incoming and outgoing call made near the time and location of the September robbery. *See* Def's

Motion to Dismiss at Exhibit A-5.  Defendant Hart failed to tell the Court the context of the calls.

The calls were made from and to Icon Advisers.  Results of a September 14, 2015 search warrant

for Icon Advisers' phone records revealed that the call at 9:22 a.m. was from Icon Adviser

employee Annie Mapple, from the HR Department, who left a voice message about Plaintiff

having expressed interest in employment at Icon Advisers and a name and return phone number to

call. *See* Dkt. # 42. at ¶ 93. The call at 9:46 a.m. was from Plaintiff to Icon Advisers and covered

the conversation that Plaintiff had with Annie Mapple.   *Id.* at ¶ 94.  The calls were therefore

innocent in nature and wholly unrelated to the robbery.  This information was omitted from the

arrest affidavit.  As a result of Defendant Hart's misrepresentations and omissions, the Court issued

the arrest warrant.

Based on the foregoing, Plaintiff asks the Court to set aside the false and misleading facts

and consider omitted exculpatory facts.

> ii.     **Setting Aside the False and Misleading Facts and Considering the Omitted Exculpatory Facts, the Arrest Affidavits Would Not Have Given Rise to Probable Cause to Arrest**

After setting aside the false and misleading facts, and considers the omitted exculpatory

facts, the Court is to determine if the arrest warrant affidavits would still have given rise to probable

cause for the issuance of the warrants.  Neither arrest warrant affidavit was sufficient to give rise

to probable cause.

"Probable cause exists where the facts and circumstances within the arresting officer's

knowledge and of which they had reasonably trustworthy information are sufficient in themselves

to warrant a person of reasonable caution to have the belief that an offense has been or is being

committed by the person to be arrested."  *United States v. Alonso*, 790 F.2d 1489, 1496 (10th Cir.

1986).  This is an objective standard, and thus "[t]he subjective belief of an individual officer as

to whether there was probable cause for making an arrest is not dispositive." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004).  Importantly, whether a reasonable officer would believe that there was probable cause to arrest in a given situation is based on the totality of the circumstances in that case.  *Id.* at 897.  "To determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from that standpoint of an objectively reasonable police officer, amounts to probable cause."  *Maryland v. Pringle,* 540 U.S. 366, 371 (2003) (internal citations and quotations omitted).  In both instances, setting aside false and misleading facts, and considering omitted exculpatory evidence, both Defendants Hart's arrest warrant affidavits lacked sufficient probable cause.

Setting aside the false and misleading facts and considering the omitted exculpatory facts, discussed *supra*, Defendant Hart's first arrest affidavit lacked sufficient probable cause.  Any tip to law enforcement was anonymous and unverified and the only eyewitness identification was tainted.  There was no other reliable basis contained in the first arrest warrant affidavit supporting probable cause for Plaintiff's arrest.

Similarly, setting aside the false and misleading facts and considering the omitted exculpatory facts, discussed *supra*, Defendant Hart's second arrest affidavit lacked sufficient probable cause.  Plaintiff's cell phone records during the time of the September robbery were innocent.  The FAVIAU analysis involved human comparison not facial recognition.  The FAVIAU results did not conclude that Plaintiff was the September robber, only that there were similar characteristics.  The FAVIAU analysis was flawed in failing to point out that Plaintiff had moles on his right side and the surveillance still frames lacked these moles. The second arrest

warrant affidavit did not contain sufficient probable cause supporting Plaintiff's re-arrest for the September 2014 robbery.

The arrest warrant affidavits, when stripped of false and misleading facts, and considering omitted exculpatory facts, lacked probable cause for issuance of the warrants.   Therefore, the Defendants are incorrect in asserting that the issuance of arrest warrants alone substantiated probable cause for both of Plaintiff's arrests.   Probable cause was the only element of Plaintiff's False Arrest, Retaliation, and Malicious Prosecution claims that Defendants challenged.[6] Therefore, Defendants conceded the merits of the remaining elements supporting Plaintiff's claims for False Arrest, Retaliation and Malicious Prosecution as cognizable.   Plaintiff can thus establish constitutional deprivations that were clearly established in 2014.   Defendants, therefore, are not entitled to qualified immunity at this early stage.   The Court should deny Defendant's Motion to Dismiss Plaintiff's False Arrest, Retaliation, and Malicious Prosecution claims premised on qualified immunity.

In moving to dismiss, the Defendants cite to Plaintiff's prior pleadings.   As justification, Defendants accuse Plaintiff of pleading around possible defenses. Defendants' accusations are not correct. The Court is tasked with determining the sufficiency of Plaintiff's Second Amended Complaint, not prior pleadings.   First, despite Defendants' assertions, Plaintiff did not omit that law enforcement received a tip identifying Plaintiff as involved in the robberies, which is explicitly stated in paragraph 39 of the Second Amended Complaint.   Second, Defendants object to

---

[6] Within its discussion of probable cause, Defendants argue that Defendants Hart and Howard are not liable for Plaintiff's malicious prosecution because the District Attorney's Office filed charges. The Tenth Circuit has held that "the chain of causation [for a malicious prosecution claim] is broken by an indictment, absent an allegation of pressure or influence exerted by the police officers, or *knowing misstatements* made by the officers to the prosecutor." *Sperry v Maes*, 592 F App'x 688, 694 (10th Cir 2014)(internal citations omitted) (emphasis added). Both of Defendant Hart's arrest affidavits contained false, misleading and omitted facts.  Setting aside the false and misleading facts and considering the omitted exculpatory evidence, Defendants lacked probable cause for both Plaintiff's arrests.  The arrest warrant affidavit was the basis for charges being brought against Plaintiff.

Plaintiff's omission that his estranged wife and other non-eyewitnesses later identified Plaintiff from a surveillance photograph of a person wearing a hat and/or glasses.   In amending his pleadings, Plaintiff, in good faith, could not confirm that these "identifications" actually took place.  This information came solely from Defendant Hart's version of events which could not be corroborated independently from the actual witnesses. Neither Plaintiff's estranged wife nor the other non-eyewitnesses have been interviewed or deposed.  If during the course of discovery, these witnesses are deposed and they confirm Defendant Hart's version of events, the Defendants will be entitled to include that information in a motion for summary judgment.  However, during the pleading stage, Plaintiff is not obligated to take Defendant Hart's assertions of fact as truth. There is no proof that Plaintiff omitted facts for the purpose of pleading around possible defenses. Therefore, the Court should disregard Defendants' citations to prior pleadings and base its decision on the sufficiency of Plaintiff's Second Amended Complaint.

## II.  PLAINTIFF 'S MUNICIPAL LIABILITY CLAIM AGAINST THE CITY AND COUNTY OF DENVER SHOULD NOT BE DISMISSED

Defendant City and County of Denver failed to adequately train its officers, including Defendants Martinez, Ruddy, and Bradley, in adequate use of force procedures when they had notice that failure to train had, and likely would, lead to harm.  Nonetheless, the City and County of Denver (hereinafter "Denver") moves to dismiss Plaintiff's claim for municipal liability. Denver's motion is premature.  As a central matter, Denver fails to view the facts plead in the light most favorable to Plaintiff, ignoring sufficient evidence that states a claim for municipal liability at this early stage.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014). "The issue in reviewing the sufficiency of a complaint is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support h[is] claims." *Ruiz*, 299 F.3d at 1181. Plaintiff has plead facts that allow the Court to draw the reasonable inference that Denver had actual or constructive notice, prior to Plaintiff's brutal assault, of inadequate use of force training. Notwithstanding such notice, Denver was deliberately indifferent in training their officers in proper use of force procedures when the risk was obvious that failure to train would cause constitutional violations.  In this case, it did.   At this formidable stage, Denver's motion to dismiss Plaintiff's municipal liability claim should be denied.

**A.**     **Defendant City and County of Denver's Failure to Adequately Train DPD Officers**

A city may be liable for failure to train, supervise, or discipline its employees.  *Allen v. Muskogee*, 119 F3d 837 (10th Cir 1997).  Denver failed to train its officers in this case.   "The inadequacy of police training may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton,* 489 U.S. at 388.   To establish a city's liability under 42 U.S.C. § 1983 for inadequate training of police officers in the use of force, a plaintiff must show:

> (1) the officers exceeded constitutional limitations on the use of force; (2) the use of force arose under circumstances that constitute a usual and recurring situation with which police officers must deal; (3) the inadequate training demonstrates a deliberate indifference on the part of the city toward persons with whom the police officers come into contact, and (4) there is a direct causal link between the constitutional deprivation and the inadequate training.

*Allen*, 119 F3d at 841-842 (citing *Zuchel v. City and County of Denver*, 997 F.2d 730, 734-35 (10th Cir. 1993).  Simply put, "to establish liability on a failure to train claim under §1983, plaintiffs 'must identify a failure to provide specific training that has a causal nexus with their injuries and

must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred.'" *Jones v. Lehmkuhl*, 2013 US Dist LEXIS 139229, at *50-51 (D. Colo. Apr. 26, 2013, Civil Action No. 11-cv-02384-WYD-CBS) (quoting *Gilles v. Davis*, 427 F.3d 197, 207 n. 7 (3d Cir. 2005)) (internal citations omitted).  Despite Denver's repeated contentions, Plaintiff did not plead a boilerplate or conclusory claim.  Rather, Plaintiff plead sufficient facts to establish all four elements of municipal liability.  It is important to remember that the Court's analysis is not whether Plaintiff will ultimately prevail on his claim, but rather the pleadings are sufficient at this stage to nudge the claim from conceivable to plausible.  Plaintiff's municipal liability claim is plausible.

First and foremost, Plaintiff must establish inadequate training.  Denver ignores a body of case law that does not require evidence of more than one incident to establish a policy of inadequate training.  The Supreme Court and Tenth Circuit "simply require evidence in addition to the occurrence of a single incident." *City of Canton*, 489 U.S. at 390 n.10; *Allen v. Muskogee, Okl.,* 119 F.3d 837, 844-845 (1997); *Board of County Comm'rs v. Brown*, 117 S. Ct. 1382 (1997).  Therefore, a plaintiff can properly rely on the single incident if there is other evidence of inadequate training. *Allen*, 119 F.3d at 845.  This applies in Plaintiff's case.

In this case, Defendants Martinez, Ruddy, and Bradley were not properly trained on what, if any, force was to be used on Plaintiff, an unarmed and restrained person.  Denver had one written use of force policy in place during the time of the incident.  It is not a stretch to assume Defendants Martinez, Ruddy, and Bradley were trained according to Denver's written use of force policy.  However, Denver's written use of force policy was insufficient to educate an officer on the permissible use of force against a restrained and unarmed person.  In fact, there is nothing in Denver's use of force policy that explains what force should be used against a restrained and

unarmed person. *See* Dkt. #42 at ¶123-128.  As a result, officers, like Defendants Martinez, Ruddy, and Bradley, are theoretically left with unfettered discretion.  In this case, Denver's inadequate training of use of force procedures lead Defendants Martinez, Ruddy, and Bradley to use excessive force against Plaintiff.  This case was a singular instance however, Plaintiff's assault is one of many prior similar instances of police brutality against unarmed and restrained persons.  Those prior instances put Denver on notice of inadequate training.  Nothing was done.  Denver was deliberately indifferent to train its officers. As a result, Plaintiff was brutally assaulted.  These facts are sufficient to nudge Plaintiff's claim for municipal liability from the conceivable to the plausible.

**B.    The Officers Exceeded Constitutional Limitations on the Use of Force**

Denver does not dispute that Defendants Martinez, Ruddy, and Bradley exceeded constitutional limitations by assaulting Plaintiff while he was unarmed and restrained. Notwithstanding, Plaintiff asserts that paragraphs 46-60 of his Second Amended Complaint sufficiently plead flagrant use of excessive force and the severe and permanent injuries that resulted.

**C.    The Use of Force Arose Under Circumstances that Constitute a Usual and Recurring Situation with which Police Officers must Deal**

Denver does not dispute that the circumstances Defendants Martinez, Ruddy, and Bradley confronted on September 15, 2014 were of the type that was usual and recurring and also the type likely to involve use of force.  On September 15, 2014, Defendants Martinez, Ruddy and Bradley were executing an arrest warrant for a suspect of two robberies who had fled the crime scenes. *See* Dkt. # 42 at ¶ 46.   The case law is clear.  This situation was "'common' (or at least not

'uncommon'), 'likely,' 'foreseeable,'or 'predictable'" to include use of force. *Brown v. Gray*, 227

F3d 1278, 1288 (10th Cir 2000); *see* Dkt # 42 at ¶32. "The situation need not be frequent or

constant; it must merely be of the type that officers can reasonably expect to confront." *Id.*  The

Supreme Court and the Tenth Circuit have found that the arrest of a fleeing felon constitutes a

usual and recurring situation where use of force is likely. *See City of Canton*, 489 U.S. at 390 n.10;

*see also Simpson v. Univ. of Colo. Boulder,* 500 F3d 1170, 1178 (10th Cir 2007).


**D.      The Inadequate Training Demonstrates a Deliberate Indifference on the part of
          Denver toward Persons with whom the Police Officers come into Contact**

Denver asserts that the Second Amended Complaint lacks sufficient facts to support

deliberate indifference.   Defendants Martinez, Ruddy and Bradley were inadequately trained,

Denver had notice of inadequate training, did nothing to change its use of force policy, and as a

result Plaintiff was injured. Therefore, Denver's argument is without merit.

 Deliberate indifference is demonstrated, "[w]hen the municipality has actual or

constructive notice that its action or failure to act is substantially certain to result in a constitutional

violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v.

Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998); *Adams v. Garvin Cnty. Bd. of Cnty. Comm'rs*,

2016 US Dist LEXIS 128765, at *60 [WD Okla Sep. 21, 2016, No. CIV-14-1337] ("[i]f there is

evidence that the municipality was on actual or constructive notice that a deficiency in their

training program causes its employees to violate the constitutional rights of its citizens, a

municipality may be deemed to be deliberately indifferent for retaining such a policy."). "In most

instances, notice can be established by proving the existence of a pattern of tortious conduct. The

Tenth Circuit has explained that "A showing of specific incidents which establish a pattern of

constitutional violations is not necessary to put the City on notice that its training program is

inadequate. Rather, evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, is sufficient to trigger municipal liability." *Allen*, 119 F.3d at 842; *Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003).

In *Zuchel v. City and County of Denver*, the Tenth Circuit Court of Appeals examined the issue of deliberate indifference, notice and the general sufficiency of evidence within the record after a jury found liability against the City and County of Denver's for civil rights violations performed by DPD officers. 997 F,2d 730 (10th Cir. 1993). As evidence of deliberate indifference, the court referenced a letter sent to Denver two and a half years before Mr. Zuchel's death that expressed concerns with the DPD's shooting trainings. *Id.* at 737-738.   Additionally, the Tenth Circuit noted that Mr. Zuchel had presented evidence through an expert in police tactics, use of force, administration, and training. *Id.* at 738. *Zuchel* proved that it is not the quantity, but quality of notice that establishes deliberate indifference.

Here, paragraphs 123-149 of Plaintiff's Second Amended Complaint includes facts that (1) Denver's use of force policy did not explain how force should be used against a restrained and unarmed person and (2) Denver was on notice of brutal assaults of restrained and unarmed persons by DPD officers well before September 15, 2014.[7]   Plaintiff must show that Denver had notice prior to Plaintiff's brutal assault that its use of force training was inadequate.   These facts, in combination, provide sufficient proof of actual or constructive notice.

Denver's use of force policy was inadequate.   The policy was insufficient to educate an officer on the permissible use of force against a restrained and unarmed person.   There was nothing

---

[7] Denver takes great effort to explain that statistics alone can not support a municipal liability argument.  Plaintiff asserts that statistics, in combination with prior cases and the City Attorney's statements, indicate *notice*, not proof of municipal liability in and of itself..  Should the Court set aside reference to statistics, prior cases are sufficient to establish notice.

in Denver's use of force policy that explains what force should be used under these circumstances. *See* Dkt. #42 at ¶123-128.  As a result, officers were theoretically left with unfettered discretion. Denver asserts that Denver's written training program was sufficient.  However, Denver police officers, had been the subject of numerous excessive force claims involving unarmed and restrained individuals, just like Plaintiff. *See* Dkt. # 42 at ¶ 130.

For example, Irene Rodriguez sued Denver in 2012 under docket 2012 Cv 1071. *See* Dkt # 42 at ¶ 130(a).  According to the Complaint, officers approached Ms. Rodriguez and without provocation twisted her hands behind her back and handcuffed her.  While unarmed and restrained, similar to Plaintiff in this case, Denver officers pushed Mr. Rodriquez down and violently yanked her arm back.

In 2011, Alexander Landau sued Denver under docket 2011 Cv 00080.  *See* Dkt # 42 at ¶ 130(jj).  According to the Complaint, while Denver officers were holding Mr. Landau's hands behind his back, he was punched in the face without provocation.  While unarmed and restrained, Denver officers struck Mr. Landau in the face numerous times with their fists, a radio, and a flashlight. A Denver officer also put a loaded revolver to Mr. Landau's head and threatened to shoot him.  Mr. Landau was beat to such an extent that he was nearly unrecognizable.

In 2010, James D. Moore sued Denver under docket 2010 Cv 00651. *See* Dkt # 42 at ¶ 130(bb). According to the Complaint, Denver officers tackled Mr. Moore from behind and struck him on the left side of his head without provocation. While unarmed and restrained, Denver officers beat Mr. Moore until he was rendered unconscious and his heart stopped beating.  Also in 2010, Rohit Murkherjee sued Denver under docket 2010 Cv 02304. *See* Dkt # 42 at ¶ 130(ff). According to the Complaint, Mr. Murkherjee was pinned against his door and choked by a Denver

officer. While unarmed and restrained, Denver officers pushed their knees into Mr. Murkherjee's face, and bent his hand and fingers back.

In 2009, Wayne Rose sued Denver under docket 2009 Cv 1498. *See See* Dkt # 42 at ¶ 130(u). According to the Amended Complaint, Mr. Rose was lying unconscious on the ground. Nonetheless, Denver officers dropped Mr. Rose on the pavement several times, beat, kicked, and pulled at his body.

In 2008, 16-year-old Juan Vasquez sued Denver under docket 2008 Cv 1196. *See* Dkt # 42 at ¶ 130(r). According to the Amended Complaint, while Mr. Vasquez was unarmed and restrained, Denver officers stuck Mr. Vasquez in the head with a closed fist, kicked him in the head, back and sides, and jumped on his body. At least one of the Denver officers involved was charged in Denver County District Court under docket number 2008 Cr 2351.

In 2005, Jeffrey Mayton sued Denver under docket 2005 Cv 1036. *See Id.* at ¶ 130(i). According to the Amended Complaint, while unarmed and restrained, Denver officers caused Mr. Mayton to sustain a dislocated shoulder, abrasions and bruising. The same year, Quincy Shannon sued Denver under docket number 2005 Cv 1496. *See Id.* at ¶ 130(j). According to the Amended Complaint, an officer grabbed Mr. Shannon without provocation, bent his arm, kicked his feet out from under him, wrenched his foot back, and handcuffed him with his hands behind his back, over the ankle of his foot. While unarmed and restrained, Mr. Shannon was maced and hit with a nightstick.

Also in 2005, David Nettles sued Denver under docket number 2005 Cv 2360. *See Id.* at ¶ 130(1). According to the Amended Complaint, officers apprehended Mr. Nettles without provocation. While unarmed and restrained, Mr. Nettles was punched in the ribs and kicked in the head and legs.

Any one of these incidences were sufficient to put Denver on actual or constructive notice of inadequate training related to the use of force against unarmed and restrained individuals. *See Cannon v. Denver*, 998 F.2d 867, 877-878 (10th Cir. 1993) (the submission of affidavits from only two individuals who alleged a pattern of post-incident similar police abuses by DPD officers was sufficient to meet the Plaintiff's burden of establishing a widespread practice at the summary judgment state). It does not matter the outcome of these cases, what matters is that Denver was aware of inadequate training.  In these cases, Denver was party to the litigation and received a copy of the pleadings.  Denver cannot feign lack of notice as to any of these incidents.

In addition, Denver City Attorney David Fine reported to the Denver City Council in September of 2010 that the City of Denver had spent nearly $6.2 million since 2004 to settle lawsuits involving police officers, and nearly all of the payouts were for allegations of excessive force. *See* Dkt. # 42 at ⁋ 130(b).  Similar statistics cited in Plaintiff's Second Amended Complaint emphasized how pervasive incidences of excessive force were in the City of Denver. *See* Dkt. # 42 at ⁋ 130(c),(d).  Plaintiff's reference to cases, the City Attorney's statements, and statistics, in combination, support his assertion that Denver was on notice.

Despite notice, Denver never changed its use of force procedures.[8] At the time of Plaintiff's brutal assault, the procedures were just as vague as they had always been, providing no training on how to act when confronted with an unarmed and restrained individual.  Plaintiff's facts, contained in paragraphs 123-149, are sufficient at this stage to establish deliberate indifference. Denver had notice that their inadequate training was causing constitutional violations

---

[8] Denver critiques Plaintiff's reference to current arguments that Denver is revising its use of force procedures, and that the revisions have garnered criticism.  This information was not intended to prove deliberate indifference, but to establish further support for how training has been inadequate.

in cases where individuals were unarmed and restrained.  Plaintiff's brutal assault was an obvious and highly predictable consequence of Denver's failure to train its officers of proper use of force.

### E.  Direct Causal Link Between the Constitutional Deprivation and the Inadequate Training

Denver argues that Plaintiff failed to plead sufficient facts that Denver's deliberate indifference caused his injuries. This argument is without merit.

Causation lies where the challenged policy or practice is "closely related to the violation of the plaintiff's federally protected right." Martin A. Schwartz, *Section 1983 Litigation Claims & Defenses*, § 7.06[A] (2013). "[I]n order for liability to attach in a failure to train case, the identified deficiency in a city's training program must be closely related to the ultimate injury, so that it actually caused the constitutional violation." *Brown v. Gray*, 227 F.3d at 1290. (internal citations omitted).  Paragraphs 123-149 of the Second Amended Complaint details (1) inadequate use of force training, (2) how the circumstances Defendants Martinez, Ruddy, and Bradley faced on September 15, 2015 was usual, recurring, and likely to involve force, (3) Defendants Martinez, Ruddy, and Bradley used excessive force, and (4) Defendants Martinez, Ruddy, and Bradley's excessive force could have been prevented because Denver had prior notice of inadequate training. Despite notice, Denver did not change its written use of force policy related to restrained individuals.  Denver was therefore, deliberately indifferent to the harm that could be caused to unarmed and restrained persons.  Plaintiff was one such person.  These facts support a reasonable inference that Denver's deliberate indifference caused Defendants Martinez, Ruddy, and Bradley's excessive application of force.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that Defendants' motion to dismiss Plaintiff's false arrest, retaliation, malicious prosecution, and municipal liability claims be dismissed.

Respectfully submitted this 24th day of May 2017.

**FISHER & BYRIALSEN PLLC**

/S/ Kaitlin F. Nares
***Kaitlin F. Nares Esq.***
***Jane Fisher-Byrialsen Esq.***
***David N. Fisher Esq.***
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street,9th Floor
Denver, Colorado 80237
Telephone:(303) 256-6345
Facsimile: (303) 954-0573
Email: Kaitlin@FBLaw.org
Email: Jane@FBLaw.org
Email: David@FBLaw.org
*Attorneys for Steven Talley*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 24th day of May 2017, I electronically filed a true and exact copy of the above and foregoing **OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following email addresses:

Writer Mott Esq.,
writer.mott@denvergov.org
Conor Farley
conor.farley@denvergov.org

/S/ Kaitlin F. Nares
***Kaitlin F. Nares Esq.***
Fisher & Byrialsen, PLLC
Email: Kaitlin@FBLaw.org