## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-2327-RPM

STEVEN CHRISTOPHER TALLEY,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER;
SERGEANT MARCO MARTINEZ;
OFFICER JOHN RUDDY; and
OFFICER JAMES BRADLEY,

      Defendants.

---

### CITY AND COUNTY OF DENVER'S MOTION FOR SUMMARY JUDGMENT

---

    Defendant, the City and County of Denver ("Denver"), through its counsel, pursuant to Fed. R. Civ. P. 56, moves for summary judgment on the municipal liability claims asserted in Plaintiff's Second Amended Complaint [Doc. # 42]:

### INTRODUCTION

    The claims remaining in this case arise out of the arrest of Plaintiff Steven Talley on September 15, 2014 by Denver Police Department ("DPD") Metro SWAT Unit members, Technicians James Bradley and John Ruddy and Sergeant Marco Martinez. Doc. # 42, at ¶¶ 46-59; Doc. # 60. Plaintiff alleges these three officers used excessive force against him and contends that Denver had a policy, practice or custom of failing to train or discipline its officers concerning the use of excessive force. Doc. # 42, at ¶¶ 123-149, 214-228.

    Denver now moves for summary judgment on Plaintiff's municipal liability claims because regardless of the theory upon which he attempts to rely, Plaintiff cannot establish Denver had a

policy, practice or custom that was the moving force behind the excessive force Plaintiff contends the officers used against him. Rather, the record establishes that Denver's training and discipline are constitutionally sufficient, there is no evidence of deliberate indifference by Denver, and Plaintiff cannot establish any causal link between Denver's training and/or discipline and the alleged harm sustained by Plaintiff. As a result, Plaintiff's claims against Denver should be dismissed as a matter of law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      On September 15, 2014, an arrest warrant was issued for Plaintiff Steven Talley for charges of robbery and assault in relation to bank robberies that took place in Denver, Colorado on May 14, 2014 and September 5, 2014. **Exhibit A**, Affidavit & Arrest Warrant.[1]

2.      At approximately 7:00 p.m. the Denver Police Department ("DPD") Metro SWAT Unit was contacted by DPD Fugitive Unit and Safe Streets Task Force to assist with the apprehension of Mr. Talley at 2689 South Jackson Street. **Exhibit C**, After Action Report[2]; **Exhibit E**, Relevant Portions of Deposition of Ruddy, at 10:22, 12:19 – 13:12; **Exhibit F**, Relevant Portions of Deposition of Bradley, at 53:15-22, and **Exhibit D**, 13:21 – 14:17.

3.      Members of the Metro SWAT Unit, including Defendants Technician John Ruddy, Technician James Bradley, and Sergeant Marco Martinez, created and implemented a plan to apprehend Mr. Talley by approaching him from multiple directions and deploying two noise flash diversionary, ordering him to the ground, and then taking Mr. Talley into custody. **Exhibit E**, at 18:20 – 25:6; **Exhibit F**, at 56:8-13; 58:11 – 76:15; **Exhibit D**, at 27:2-23, 29:8 – 31:11.

4.      Mr. Talley complied with the instructions of the approaching police officers and

---

[1] **Exhibit B**, Declaration of DPD Records Custodian, Dik Kushdilian.
[2] Sergeant Martinez drafted the After-Action Report on September 15, 2014 following Mr. Talley's arrest. *See* **Exhibit D,** Relevant Portions of Deposition of Martinez, at 111:10 – 114:12.

did not resist being taken into custody. Doc. # 42, ¶ 52; **Exhibit C**; **Exhibit E**, at 40:12-20; 41:3 –

42:13, **Exhibit F**, at 69:11-23; **Exhibit D**, at 65:2-12.

5.       Technicians Ruddy and Bradley have been employed by Denver as sworn officers

of its police department since November 2001 when they both went through the DPD Lateral

Recruit training class at the Denver Police Academy after spending nearly eight years as a deputy

with the Eagle County Sheriff's Office. *See* **Exhibit G**, Ruddy DPD Officer Resume and Training

Transcript, at DENVER 001672; **Exhibit E**, Deposition of Ruddy, at 11:23 – 12:12; 75:1-19;

**Exhibit H**, Bradley DPD Officer Resume and Training Transcript, at DENVER 001697; **Exhibit

F,** Deposition of Bradley, at 84:18-19, 85:14-19.

6.       Officer Bradley joined the DPD Metro SWAT Unit in 2005. **Exhibit F**, at 84:15-

17. Officer Ruddy joined the DPD Metro SWAT Unit in 2008. **Exhibit E**, at 76:25 – 77:2.

7.       Marco Martinez has been employed by Denver as an office of its police department

since September 1995 when he went through DPD Basic Recruit training class at the Denver Police

Academy. **Exhibit I,** Martinez DPD Officer Resume and Training Transcript, at DENVER

001682; **Exhibit D**, at 6:22-23. He joined the DPD Metro SWAT Unit in 2014. *Id.*, at 7:5-7.

8.       All officers receive training on the Operations Manual and the Rules and

Regulations of the Department, including, but not limited to, Denver's policies regarding use of

force and reporting use of force. **Exhibit J**, Relevant Portions of Denver's Response to Revised

First Discovery, Interrogatory # 2, pp. 5-6.

9.       All Denver police officers also receive training in general arrest procedures,

including arrest control and defensive tactics, the appropriate use of force, when necessary, the

requirement of reporting all uses of force. **Exhibit K**, Relevant Portions of DPD Operations

Manual, at DENVER 000138, 000215-35.

10.     The 2014 DPD Operations Manual directs that all officers making an arrest "will be accountable to existing procedures or directives governing arrests, use of force and reporting of the same." **Exhibit K**, at DENVER 000138.

11.     The DPD Operations Manual also contains the use of force policy, including applicable state statutes and controlling case law, as well as concepts and definitions that include types of resistance, factors to determine objectively reasonable force options, and use of force / control options. *Id.* at DENVER 000215-219.

12.     The policy also addresses procedures that addressed the duty to report and the duty to request medical attention when force is used, an injury is complained of, or an injury is observed. further outlined less lethal force and control options, the role of the Use of Force Review Board, tactics review board, and the role and procedures of a crisis intervention team. *Id.* at DENVER 000219-235.

13.     The basic curriculum for the Denver Police Academy classes in 1995 and 2000, the classes Technicians Ruddy and Bradley, and Sergeant Martinez, respectively, attended, trained officers extensively on permissible use of force, use of force considerations, de-escalation of force, and alternatives to using force. **Exhibit J**, at Interrogatory # 1; *see also* **Exhibit L**, 1995 DPD Basic Recruit Class Curriculum and Course Materials; **Exhibit M**, 2000 DPD Basic Recruit Class Curriculum and Course Materials.

14.     The officers also received on-the-job training throughout their employment as well as formal training classes held by Denver and other sources. **Exhibit J** at Interrogatory # 2; *see* **Exhibit G**, at DENVER 001672–001675, **Exhibit H**, at DENVER 001697–001700, and **Exhibit I**, at DENVER 001682–001686. This includes training, training updates, and training bulletins on use of force and reporting uses of force trainings that Defendants attended or received throughout

their careers. *Id.*; *see also* **Exhibit N**, Training Update, **Exhibit O**, Training on Operations Manual Revision; **Exhibit P**, Training Bulletin on Use of Force Report; **Exhibit Q**, 2015 Use of Force Training Presentation; **Exhibit R**, 2000 Training Update on C.R.S. § 18-1-707; **Exhibit S**, Course Information for 2003 Use of Force Training; **Exhibit T**, 2004 Training Bulletin on Use of Force Policy; **Exhibit U**, Arrest Control Training Overview.

15.     Members of the DPD Metro SWAT Unit, including Technician Ruddy, Technician Bradley, and Sergeant Martinez, also receive additional specialized training in areas such as high-risk apprehensions, and tactical operations that are unique to SWAT operations. **Exhibit V**, Relevant Portions of Denver's Supplemental Responses to Revised First Discovery at Interrogatory # 2, p. 3; **Exhibit W**, Ruddy SWAT Training Record; **Exhibit X**, Bradley SWAT Training Record; and **Exhibit Y**, Martinez SWAT Training Record.

16.     As members of the DPD Metro SWAT Unit, Officer Ruddy, Officer Bradley, and Sergeant Martinez are also required to maintain certifications on specific items of SWAT equipment that they use in the performance of their duties, including Noise Flash Diversionary Devices. **Exhibit V**, at Interrogatory # 2, p. 3.

17.     Denver police officers also receive training on a comprehensive disciplinary handbook to give them notice of the sets conduct principles and disciplinary guidelines the Department will employ in making disciplinary decisions. **Exhibit Z**, DPD Discipline Handbook. The handbook also contains a disciplinary matrix system which assists the Department with providing consistent discipline, when it is determined that discipline is warranted. *Id.*, at §§ 12.0 – 16.0, pp. 15-20, Appendix F. The handbook expressly outlines the controlling principles and specific practices in place by outlining the policies, protocols, and procedures followed by DPD and the Department of Safety in its disciplinary practices. *Id.*

18.     In 2013 through 2015, the process in place by DPD IAB to investigate claims of misconduct began with a lieutenant assigning a sergeant to the investigation. **Exhibit AA**, Declaration of Todd Fuller, at ¶¶ 2-3. During the initial investigation, the assigned sergeant would typically contact the complainant, review the DPD CAD report to identify the police officers involved in the response to the incident at issue, review any available video or audio of the incident, and obtain any relevant medical records. *Id.* at ¶ 4.

19.     After the initial investigation, the IAB sergeant typically obtained statements from the officers who were subjects of the complaints, either through an in-person written statement or an in-person interview. *Id.* at ¶ 5. As to investigations related to complaints of inappropriate force, a written statement to the events was obtained from the subject officer(s), if identified. *Id.* In about half of the cases, the written statement would suffice and no interview needed to be completed. *Id.* If there were areas that needed to be clarified, an interview would then follow in the form of a question and answer format where the investigating sergeant would write out the question and the subject officer(s) would write out a respond. *Id.* These written interviews would take place in the IAB office. *Id.* If warranted, a videotaped interviews of the officer(s) could also be conducted. *Id.*

20.     After the IAB sergeant completed the investigation, the case would be summarized and forwarded to the supervising lieutenant, who reviewed the investigation for completeness. *Id.* at ¶ 6. If the supervising lieutenant had questions or saw gaps in the investigation, the IAB sergeant was assigned to conduct follow-up investigation as needed. *Id.* Once the supervising lieutenant was satisfied that the investigation was complete, the investigation was then forwarded to the IAB commander, who conducted another review. *Id.*, at ¶ 7 The IAB Commander could also send the investigation back to the IAB sergeant for any follow-up the commander believed necessary. *Id.*

21.     Once the IAB commander was satisfied that the investigation was complete, the investigation was sent to the Office of the Independent Monitor ("OIM) for another level of review. *Id.* at ¶ 7.   If the Independent Monitor or other OIM staff felt that the case was not complete, it would be sent back to IAB for further investigation or additional follow-up. *Id.*, at ¶ 8. The additional investigation would take place and then go back to the OIM until the OIM agrees that the case is complete. *Id.*

22.     At the conclusion of this process, the results of the IAB investigation were sent to the DPD Conduct Review Office ("CRO") to determine the discipline to be imposed on the subject police officer(s), if any. *Id.*

23.     In November 2014, Mr. Talley complained that unnecessary force was used during his arrest, and Sergeant Brian Cotter in DPD IAB was assigned to conduct the investigation. **Exhibit BB**, Declaration of Brian Cotter, at ¶ 3.

24.      As part of the investigation, Sergeant Cotter reviewed the After-Action Report completed on September 15, 2014 by DPD Sergeant Marco Martinez related to Mr. Talley's arrest. The Report indicated that Mr. Talley had been ordered to the ground during the arrest by members of the DPD Metro SWAT Unit and was taken into custody without incident, noting that among others, Lieutenant Michael O'Donnell, Sergeant Martinez, and four members of the DPD Metro SWAT Unit were at the scene of the arrest. *Id.*, at ¶ 4.

25.     After reviewing the statement and other available documentation, Sergeant Cotter interviewed Mr. Talley in person, regarding his complaint related to his September 15, 2014 arrest. *Id.*, at ¶ 5. During that interview, Mr. Talley also made statements regarding events related to another complaint, which had led to a separate IAB case. *Id*. Specifically, Mr. Talley alleged in that unrelated incident he had been released from jail wearing only a t-shirt and underwear in the

snow, that he walked to the DPD District 6 Station immediately after his release, asked officers at the station for information on homeless shelters, that they told him to go sleep outside in negative 13-degree weather, and that he therefore had to go outside and sleep in the snow. *Id.* Video footage from the District 6 Station, however, showed that patrol officers had actually transported Mr. Talley in a patrol car to a shelter that evening, and demonstrated that his statements to Sergeant Cotter during his interview about that incident were unequivocally and demonstrably false. *Id.*

26. As to complaint related to the September 15, 2014 arrest, Mr. Talley claimed that he had sustained serious injuries to his leg, neck, lower back, and ribs, and a fractured sternum as a result of the officers' alleged use of force during his arrest. *Id.*, at ¶ 6. He provided a medical release, but the medical records from the Denver Sheriff Department showed that Mr. Talley made no contemporaneous complaint of injury and had no observed injuries at the time of his arrest or shortly after his arrest when he was evaluated by Denver Health medical staff during his intake at the Downtown Detention Center. *Id.*

27. On January 9, 2015, Sergeant Cotter interviewed Mr. Talley's roommate at the time of his September 15, 2014 arrest, Brian Martin, who saw Mr. Talley sitting outside their residence immediately after his arrest. *Id.*, at ¶ 7. Mr. Martin reported that he did not see or hear any indication that Mr. Talley was injured. *Id.*

28. Sergeant Cotter ultimately determined it was not necessary to conduct in-person interviews with the DPD Metro SWAT Unit officers who arrested Mr. Talley because he believed that the evidence demonstrated that Mr. Talley's allegations lacked any merit. *Id.*, at ¶ 8. This was based on the information in the After-Action Report, the absence of any medical documentation of Mr. Talley's claimed injuries, Mr. Talley's demonstrably false statements related to a separate

incident during his interview, Mr. Talley's delay in reporting what he claimed were severe injuries, and the report of independent witness Mr. Martin. *Id.*

29.    In addition, Sergeant Cotter found it significant that even though both a lieutenant and sergeant were on the scene of the arrest, there was no Use of Force report (a Use of Force report is required to be completed any time force is used or when a suspect complains of an injury) and the absence of such a report further indicated that Mr. Talley was arrested without incident as described in the After-Action Report. *Id.*

## ARGUMENT

A municipality cannot be held liable for the actions of its employees under the theory of *respondeat superior*; it can only be held liable when a municipal policy of some nature causes a constitutional violation. *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and therefore make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Accordingly, to prevail on a municipal liability claim, in addition to demonstrating a Fourth Amendment excessive force violation by one or more Denver police officers, Plaintiff must demonstrate that a Denver policy or custom caused or was the moving force behind his injuries. *See Harte v. Bd.  of Comm'rs of Cnty. of Johnson, Kansas*, 863 F.3d 1154, 1195 (10th Cir. 2017). This requires Plaintiff to demonstrate (1) a custom, policy or practice of failing to train investigate or discipline officers to prevent the use of excessive force (2) a direct causal link between the alleged policy or practice and the use of excessive force, and (3) deliberate indifference. *See Schneider v. City of Grand Junction*, 717 F.3d 760, 769 (10th Cir. 2013); *Brown v. Gray*, 227 F.3d 1278, 1286 (10th Cir. 2000) (discussing the elements of a claim for failure to

train); *Trujillo v. Campbell*, No. 09-cv-03011-CMA-KLM, 2012 WL 3609747, at *6 (D. Colo. Aug. 22, 2012) (outlining similar elements for a failure to discipline claim); *City of Canton v. Harris,* 489 U.S. 378, 388-89 (1989) (only if plaintiff can show that the municipality's conduct amounts to deliberate indifference to the rights of persons with whom the police come into contact can such a shortcoming be properly thought of as a 'policy or custom' that is actionable under § 1983).

Here, Plaintiff seeks to impose municipal liability based upon allegations that Denver failed to train its officers on the appropriate use of force. Doc. # 42, at ¶¶ 123-149. Additionally, although not pled in the Second Amended Complaint, during discovery Plaintiff disclosed a police practices expert, Dan Montgomery, who offered alternative opinions that Denver allegedly failed to adequately investigate and/or discipline officers for excessive force and, according to Mr. Montgomery, this is tantamount to a failure to train. **Exhibit GG**, Relevant Portions of Deposition of Montgomery, at 27:6-28:7. Via the opinions of Mr. Montgomery, in addition to his failure to train claim, Plaintiff presumably intends to alternatively assert that Denver failed to investigate and discipline officers for using excessive force. Accordingly, this Motion will address Plaintiff's inability to prevail under any of these theories.

1.      **Plaintiff cannot show that Denver's training, investigation, or discipline was inadequate**

To prevail on a failure to train, investigate or discipline, Plaintiff must offer evidence sufficient to establish that an actual deficiency existed in Denver's training, investigation or disciplinary process. *See, e.g., Brown*, 227 F.3d at 1286 (to prevail on a failure to train claim, the "plaintiff must first prove that the training was in fact inadequate). Here, Plaintiff is unable to make such a showing because it is undisputed that Denver provides its police officers with

significant training on arrest control techniques and the use of force, has a detailed investigation process that includes factual findings by the Internal Affairs Bureau and review by the Office of the Independent Monitor and has established a di1sciplinary system that includes a disciplinary matrix to ensure consistency when discipline is imposed. Statement of Undisputed Material Fact ("SUMF"), at ¶¶ 8-26.

Here, Plaintiff has failed to identify any specific deficiency in Denver's training, investigation into officer conduct or disciplinary process and such failure entitles Denver to summary judgment on his municipal liability claims and he does not explain how the excessive force he alleges was used against him during his arrest could have been avoided with different or better training, investigation or discipline. In the absence of the identification of any specific deficiencies in Denver's training, investigation or discipline, Plaintiff's general assertions that there was a failure to train, investigate or discipline fail as a matter of law. *See*, *e.g.*, *City of Canton*, 489 U.S. at 390 ("In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular officers must perform.") "To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983. In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *Id*. at 391-92 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)).

a.  Training on Use of Force

Early in discovery, Plaintiff was asked to identify if the incident at issue was a result of a failure by Denver to adequately train officers Bradley, Ruddy and/or Martinez on the proper use of force and, if so, to specify (a) the policies on which he claimed training was inadequate, (b) how Denver inadequately trained or failed to train on those policies, and (c) what, if any, different or

additional training Denver should have provided. Plaintiff's Response to First Combined Written Discovery Requests, relevant portions attached as **Exhibit HH**, at Interrogatory # 17, p. 17. Plaintiff did not provide any substantive response whatsoever to the request, instead claiming that it "seeks information and/or documents in the possession, custody and/or control of Defendants," was "unduly burdensome," and "calls for legal argument." *Id.* Finally, Plaintiff refused to provide this information on the grounds that the request "seeks information and/or documents that can be obtained by other more appropriate means such as FRCP 30(b)(6) deposition or expert disclosures produced pursuant to FRCP 26." *Id.* Prior to the completion of discovery, Plaintiff did not supplement this response and did not take a Rule 30(b)(6) deposition.

In an attempt to bolster his municipal liability claim, Plaintiff has retained and disclosed Dan Montgomery to offer opinions about Denver.  The scope of Mr. Montgomery's disclosed opinion on Plaintiff's failure to train theory is:

> [i]f in fact Mr. Talley's allegations are true regarding the beating and the verbal abuses, the conduct of the arresting officers was certainly not in concert with well-established and modern police practices, and *certainly not what reasonably-trained and prudent police officers would likely have done* given the same or similar circumstances.

**Exhibit II**, at ¶ 2a, p.12 (emphasis added). At a minimum, this opinion is insufficient because it is speculative, wholly conclusory, and simply recites an element of the claim without identifying the specific deficiency in training or factual basis for that opinion. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). More importantly, Mr. Montgomery does not identify any *specific* deficiency in Denver's training related to the use of force and his opinion does not counter the fact that Denver officers have been trained in the use of force. Plaintiff cannot survive summary judgment by simply relying upon alleged violations by the individual defendants and then, without

12

any further factual substantiation, contending that such actions were consistent with and caused by a municipal policy, procedure, or failure to train. *See Atwell v. Gabow*, Civ. Nos. 06-cv- 02262-JLK, 07-cv-2063-JLK, 2008 WL 906105, at *8 (D. Colo. Mar. 31, 2008) ("Simply aggregating eight individual claims and calling them the result of a 'custom or policy of discrimination' is insufficient, as are all of the other conclusory recitations of *Canton* or similar legal standards as 'facts' supporting municipal liability."); *see also Ridge at Red Hawk, LLC, v. Schneider*, 493 F.3d. 1174, 1177 (10th Cir. 2007). "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91; *see*, *e.g.*, *Estate of Bleck v. City of Alamosa*, 105 F.Supp.3d 1222, 1233 (D. Colo. May 2015) ("In the absence of vicarious liability, the City may not be held liable based upon a single instance in which an officer acted contrary to the specific dictates of his training.")

Critically, the undisputed evidence shows that Denver provides extensive training to its police officers, including Technician Bradley, Technician Ruddy, and Sergeant. Martinez, on the appropriate use of force. Each of the individual defendants received training at the Denver Police Academy on permissible use of force, use of force considerations, de-escalation of force, and alternatives to using force when they first joined DPD as recruits. SUMF, at ¶¶ 7, 13. They also received on-the-job training throughout their careers, and in addition received extensive formal training classes from DPD and other sources regarding the use of force. SUMF, at ¶¶ 8-12, 14. In addition, as members of the Metro SWAT Bureau, Technician Bradley, Technician Ruddy and Sgt. Martinez received specialized training on topics unique to SWAT such as high-risk apprehensions and tactical operations. SUMF, at ¶¶ 15-16.

Accordingly, because Plaintiff cannot establish that any specific deficiency exists with Denver's use of force training, his municipal liability claim based on a failure to train theory necessarily fails.

      b. <u>Discipline and Internal Affairs</u>

Plaintiff was also asked in discovery to identify if he was claiming the incident at issue was a result of a failure by Denver to discipline Officers Bradley, Ruddy, and/or Martinez and, if so, to specify (1) the date(s) of the conduct in which he claimed Officers Bradley, Ruddy, and/or Martinez engaged for which they were not disciplined or were inadequately disciplined, (2) the nature of such conduct, and (3) the disciplinary action that he claims Denver should have taken against them for such conduct. **Exhibit HH**, at Interrogatory # 18, p.18. Again, Plaintiff did not provide any substantive response and simply restated the same objections as to the request related to training on the grounds of Denver being in possession of that information, unduly burdensome, calling for a legal conclusion, suggesting a Rule 30(b)(6) deposition, and arguing the information was subject to expert opinions. *Id.*

With respect to IAB investigations, Plaintiff's retained expert Dan Montgomery is critical of certain aspects of the internal affairs investigation that occurred into the specific allegations made by Plaintiff. **Exhibit II**, at § 1c-e, pp. 10-11. He then offers a single paragraph with the generalized and wholly conclusory opinion that "[t]his is certainly not the first time [DPD] has failed to properly investigate allegations of misconduct that have been filed against police officers, and this tendency will be discussed further in the report," and incorporates his purported understanding of a few other cases that occurred prior to 2012. *Id.*, at § 1f, p. 12. However, that referenced section is simply a recycled opinion related to DPD internal affairs investigations from a previous report relating to a 2010 incident. *Id.*, at § 4, p.14; **Exhibit GG**, at 44:12 – 48:11. In

doing so, Mr. Montgomery continues to rely upon information from former Denver Independent Monitor Richard Rosenthal issued in 2010, a report from the Citizen Oversight Board from 2011, and data from unknown sources for the years 2009, 2010, 2011, and a period from 1997-2010. **Exhibit II**, at § 4a-h, pp. 14-17. In fact, Mr. Montgomery has not looked at any records or reports from the Office of Independent Monitor (OIM) or the Citizen Oversight Board since 2011. **Exhibit GG**, at 49:6-9; 50:4-16. Mr. Montgomery does not know if any changes were made between 2011 and the date of Mr. Talley's 2014 arrest in the DPD Internal Affairs policies or practice. *Id.*, at 50:17-21.

Further, and more importantly, Mr. Montgomery fails to address critical aspects of the IAB investigation related to Plaintiff's complaint of excessive force that underlies this lawsuit. Specifically, Mr. Montgomery does not address the significance of Mr. Talley's established lack of credibility when he was shown to have been untruthful in a separate IAB investigation during the same period. SUMF, at ¶ 25. Mr. Montgomery fails to give any weight to the lack of any contemporaneous complaints or evidence of physical injury despite the very serious nature of the injuries alleged. SUMF, at ¶ 26. Mr. Montgomery ignores that the DPD IAB investigator interviewed Plaintiff's then roommate who reported that he saw Plaintiff immediately after his arrest but did not see or hear any indication that he was injured. SUMF, at ¶ 27. Mr. Montgomery also fails to address the fact that multiple witnesses to Plaintiff's arrest (including law enforcement that was not part of DPD and DPD supervisors) did not submit any complaint or a Use of Force report related to Mr. Talley's arrest. SUMF, at ¶ 29.  In short, the DPD IAB investigator determined not to conduct in-person interviews with the DPD Metro SWAT Unit officers who arrested Mr. Talley because the evidence demonstrated that Plaintiff's allegations lacked any merit. *Id.*, at ¶ 28. While Mr. Montgomery may be critical of certain specific aspects of the internal affairs

investigation of Plaintiff's allegations, he provides no basis whatsoever to conclude that it was constitutionally deficient. Moreover, Mr. Montgomery fails to address any aspect of the DPD disciplinary system as outlined in the DPD Discipline Handbook. **Exhibit Z**. This includes the disciplinary matrix system, the principles and specific practices in place, and the policies, protocols, and procedures followed by DPD and the Department of Safety in its disciplinary practices. SUMF, at ¶ 17.

Therefore, Plaintiff has not demonstrated that any specific deficiency exists with Denver's internal investigations or discipline procedures, and his municipal liability claim based on such a claim – the extent it is stated – cannot survive summary judgment.

### 2.      Plaintiff cannot demonstrate deliberate indifference by Denver.

"A municipality's culpability for a deprivation of rights is most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Further, "[r]arely if ever is 'the failure of a police department to discipline in a specific instance ... an adequate basis for [governmental] liability.'" *Schneider*, 717 F.3d at 777 (quoting *Butler v. City of Norman*, 992 F.2d 1053, 1056 (10th Cir. 1993)). Rather, a city may be found deliberately indifferent only when policymakers are on "actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional action, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). Such notice is rarely demonstrated by a single incident of deficient action or inaction. *See Tuttle*, 471 U.S. at 823-24. Deliberate indifference may only be found absent a pattern of discriminatory behavior in a narrow range of circumstances if a violation of federal rights is a "highly predictable" or "plainly obvious" consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious

potential for constitutional violations. *See Barney*, 143 F.3d at 1307-08. However, the fact "someone with the opportunity to prepare an expert report at leisure opines that well-trained officers would have performed differently under pressure does not rise to the legal standard of deliberate indifference on the part of the City." *Carr v. Castle*, 337 F.3d 1221, 1230 (10th Cir. 2003).

Here, Plaintiff is also unable to establish the deliberate indifference element of his claim against Denver because he cannot point to any evidence which could be said to have placed Denver on notice—whether actual or constructive—that his asserted general failures to train, investigate or discipline were substantially certain to result in a Fourth Amendment violation with respect to the use of force. There is absolutely no evidence of a pattern of similar uses of alleged excessive force by officers who purportedly lacked sufficient training in the use of force. *See Connick*, 563 U.S. at 62. Moreover, the Operations Manual and the officers' training records in this case confirm that DPD officers are appropriately trained in the use of force. SUMF, at ¶¶ 7-16.

Further, to establish the deliberate indifference element of a failure to discipline claim, Plaintiff must present evidence of other, prior incidents that involved conduct similar to that alleged here but for which officers did not receive discipline, including a showing of why the use of force in similar cases should have resulted in discipline. *See Trujillo v. Campbell*, No. 09-CV-03011-CMA-KLM, 2012 WL 3609747, at *6 (D. Colo. Aug. 22, 2012) (citing *Merman v. City of Camden,* 824 F.Supp.2d 581, 591 (D.N.J. 2010) (recognizing that rather than merely reciting a number of complaints, "a Plaintiff must show why those prior incidents deserved discipline and how the misconduct in those situations was similar to the present one")). Plaintiff has not—and cannot—identify a pattern of similar constitutional violations. Nowhere in Denver's policies or training, or even in the officers' testimony regarding the incident, is there any evidence, as Plaintiff

17

claims, that Denver officers were taught to use inappropriate or excessive force when arresting a suspect or that the investigation and discipline process was constitutionally deficient in any way. The opinions offered by Plaintiff's expert also fail to raise a genuine issue of material fact concerning Denver's alleged deliberate indifference regarding its policies, IAB investigations and disciplinary process. The record is simply devoid of any evidence sufficient to show that Denver should have been notice of any "obvious" or "highly predicable" deficiency with respect to the use of force training it provides to its officers or the IAB investigation or disciplinary process.

The Second Amended Complaint's boilerplate laundry list of prior lawsuits against Denver and settlements also cannot establish deliberate indifference. Doc. # 42, ¶ 130. However, where prior incidents are used to prove a pattern, they must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the except, accept practice of city employees." *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009). The number of prior instances needs to be considered in the context of the size of the police force and the number of police contacts. For instance, in *Peterson*, the court found that twenty-seven complaints of excessive force against a city's police officers over a three-year period did not establish a pattern of a municipal policy because there was no evidence of the department's size or the number of arrests to put the number of complaints in context. *Id*. Plaintiff's list of prior incidents also includes many incidents that have no similarity to his claims whatsoever. For instance, several incidents listed by Plaintiff do not even involve the DPD, but instead involve allegations against an entirely separate Denver agency, the Denver Sheriff Department. *See* Doc. # 42 at ¶130(e), (f), (dd), (ll) (identifying lawsuits brought against the Denver Sheriff Department for a variety of reasons, including inadequate medical care, use of force, and failure to protect inmates)].

Accordingly, Plaintiff was asked in discovery to identify if the incident at issue was a result of a pattern or practice of Denver police officers using excessive force of which Denver was aware and, if so, to describe with specificity any events that he claimed put Denver on notice of a pattern or practice of excessive force by Denver police officers, including (a) the dates of such events, (b) the nature of force used in each event he claims was inappropriate, (c) and the individuals involved. Plaintiff did not provide any substantive response. **Exhibit HH**, at Interrogatory # 19, p. 18. Once again, Plaintiff restated the same objections as to the requests related to training and discipline and failed to provide any substantive response other than it would be the subject of expert opinions. *Id.* However, Plaintiff's retained expert Dan Montgomery simply states that he is aware of a handful of prior lawsuits against Denver and/or or DPD officers where he was paid to be an expert, but provides absolutely no context for those lawsuits other than his recollection of the outcome – some were settled, one led to a jury award, a few were "administratively cleared" or had a defense verdict, and others had an unknown resolution.   **Exhibit II**, at § 3a, p. 14. This is inadequate. Merely listing other cases involving uses of force is not sufficient to establish the existence of a widespread custom or practice, let alone deliberate indifference to such a practice. *See Strauss v. City of Chicago*, 760 F.2d 765, 768-69 (7th Cir. 1985); *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) (number of complaints is insufficient to prove custom); *Carter v. District of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986) (a listing of prior incidents of excessive force is not sufficient for municipal liability as "then practically every large metropolitan police force … could be targeted for such liability"); *Franks v. Cape May County*, No. 07-6005, 2010 WL 3614193, at *11-12 (D.N.J. Sept. 8, 2010) (rather than simply reciting a number of complaints or offenses, a plaintiff must show why those prior incidents deserved discipline and how misconduct in those cases is similar to that involved in the present action); *Watson v. City of Kansas City, Kansas*, No.

CIV.A.99-2106-CM, 2002 WL 922155, at *5 (D. Kan. April 12, 2002), *aff'd sub nom. Watson v. Unified Gov't of Wyandotte Cnty./Kansas City*, 70 F. App's 493 (10th Cir. 2003) ("to establish a custom or usage sufficient to establish a municipal policy or custom under Section 1983 principles, [plaintiffs] must establish: 1) that the prior grievances were the same or substantially similar to the plaintiffs' constitutional injury; and 2) that the final policy-making authority of the municipality had actual or constructive notice of the prior unconstitutional acts of employees to establish deliberate indifference."); *Trujillo v. Campbell*, No. 09-cv-030110- CMA-KLM, 2012 WL 3609747, at *6-7 (D. Colo. Aug. 22, 2012) (a plaintiff must show why "prior incidents deserved discipline and how the misconduct in those situations was similar to the present one").

To the extent Plaintiff is also relying on Mr. Montgomery's recycled opinions regarding information from prior to 2012 in support of this element, it is also misguided. **Exhibit II**, at § 4a-i, pp. 14-17. In 2012, OIM issued a report that found "[i]n late 2011, a new chief, Robert White, took the helm of [DPD] and selected new commanders for many of the DPD's most significant leadership positions." 2012 OIM Annual Report, relevant sections attached as **Exhibit CC**,[3] at p. 4. Further, OIM reported its "positive impression, to date, of some of Chief White's recent changes to the DPD disciplinary process. Working with the Department of Safety, Chief White created the Conduct Review Office ("CRO") to expedite disciplinary decisions and streamline what had been the notoriously unwieldy process of DPD command review." *Id.* Further, OIM found in 2012 that "[t]hese changes appear to be bearing fruit." *Id.* In 2013, OIM explained that "[a] core OIM function is reviewing IAB investigations to ensure that they are thorough, complete and fair to both community members and officers." 2013 OIM Annual Report, relevant sections attached as

---

[3] The entire 2012 OIM report (and all OIM reports issued from 2012-2018) are publicly available: https://www.denvergov.org/content/denvergov/en/office-of-the-independent-monitor/reports.html *See also* **Exhibit FF**, Declaration of OIM Independent Monitor, Nick Mitchell.

**Exhibit DD**,[4] at p. 4. Accordingly, in 2013 OIM reviewed 521 IAB investigation in the DPD, which "included the examination of all relevant evidence obtained, including recorded interview, police reports and medical records, if available." *Id.* When OIM "agreed that the investigations were thorough and complete, [it] approved the cases to move forward in the disciplinary process. When [OIM] identified a need for further investigation, [it] returned the cases to IAB with recommendation for additional investigation." *Id.* OIM "also reviewed 130 cases going through the disciplinary process, making recommendations on the appropriate outcome under the departmental disciplinary matrices." *Id.* Further, OIM reported that "[i]n May 2013, Ron Thomas was appointed acting commander of IAB. Commander Thomas has been an effective supervisor of IAB, and has achieved significant improvements in both the quality and efficiency of case handling within the unit." *Id.*, at p. 11.

In 2014, OIM reviewed 614 IAB investigation in the DPD, which "included examining a voluminous quantity of evidence, including recorded interviews, video footage, police reports, and medical records. When [OIM] identified a need for further investigation of particular cases, [OIM] returned them to IAB with recommendations for additional work." 2014 OIM Annual Report, relevant sections attached as **Exhibit EE**,[5] at p. 5. OIM "also reviewed 139 cases going through the disciplinary process, making recommendations on the appropriate disciplinary outcome, if any, under the departmental disciplinary matrices." *Id.*

Further, and particularly relevant here, the OIM analysis for the years 2006 through 2012 reflect a decline in community complaints from just over 1.2 per 1,000 police-community contacts

---

[4] *Id.*

[5] *Id.*

in 2006 to just over 1.0 per 1,000 police-community contacts in 2012. **Exhibit CC**, p. 19. The

OIM analysis for the years 2009 through 2013 show the number of DPD officers who received

zero use of force complaint increased from 84.6% in 2009 to 92% in 2013, with less than 1% of

DPD officers receiving more than one use of force complaint in 2013. **Exhibit DD**, p. 25.

Accordingly, Plaintiff has fallen far short of establishing that Denver's "action or failure

to act is substantially certain to result in a constitutional action, and it consciously or deliberately

chooses to disregard the risk of harm" as is necessary to prove deliberate indifference by Denver.

*Barney*, 143 F.3d at 1307; *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 769

(10th Cir. 2013). For all of these reasons, Plaintiff has failed to establish the element of deliberate

indifference and, as a result, his municipal liability claims cannot survive summary judgment.

### 3.   There is no evidence establishing a causal link between Denver's training and the alleged use of force on Plaintiff.

Finally, Plaintiff can only prevail on his municipal liability claim if he can establish "a

direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cty.

Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997). Therefore, Plaintiff must show

how part or all of Denver's alleged failures to train, investigate or discipline allegedly caused the

officers' use of excessive force against him. *See Carr*, 337 F.3d at 1231-32; *Estate of Reat v.

Rodriguez*, No. 12-CV-02531-REB-MEH, 2014 WL 4358333, at *11 (D. Colo. Sept. 3, 2014)

(plaintiff did not sufficiently allege a direct causal link between the alleged failure to train and

his injury because plaintiff failed to adequately identify how Denver's policy actually caused the

injury). As Plaintiff has never identified what specific deficiency in Denver's training,

investigation or discipline could have directly caused the individually named officers to allegedly

use excessive force against him, he is unable to show the direct causal link necessary to continue

with his municipal liability claim.  *See Brown*, 520 U.S. at 405 ("rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."). For this reason as well, Denver is entitled to summary judgment.

## CONCLUSION

Plaintiff's attempt to impose municipal liability under the circumstances of this case fails. Plaintiff has identified no specific deficiency in Denver's training, investigation or discipline with respect to officers' use of force. As a result, he cannot show deliberate indifference by Denver or that his allegations of a failure to train, investigate or discipline directly caused the officers' alleged use of force against him.  Accordingly, Denver is entitled to summary judgment.

**WHEREFORE**, for the reasons discussed above, the City and County of Denver respectfully requests that the Court enter summary judgment in its favor and dismiss Plaintiff's Second Amended Complaint [Doc. # 42] against it, in its entirety, with prejudice.

Dated this 4th day of March, 2019.

Respectfully submitted,

*s/ Conor D. Farley*
Conor D. Farley, Assistant City Attorney
Melanie Lewis, Assistant City Attorney
Denver City Attorney's Office
Civil Litigation Section
201 West Colfax Ave., Dept. 1108
Denver, Colorado 80202
Telephone: (720) 913-3100
Facsimile: (720) 913-3131
E-mail:  conor.farley@denvergov.org
E-mail:  melanie.lewis@denvergov.org
*Attorneys for Defendants*

## CERTFICATE OF SERVICE

I hereby certify that on this 4th day of March, 2019, a true and correct copy of the foregoing **CITY AND COUNTY OF DENVER'S MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kaitlin F. Nares, Esq.
David N. Fisher, Esq.
Fisher & Byrialsen, PLLC
Kaitlin@fblaw.org
David@fblaw.org
*Attorneys for Plaintiff*

*s/Conor D. Farley*
Denver City Attorney's Office